The next case of the day, which is cause number 17-11158, Da Vinci Investment v. City of Arlington. Party's ready to proceed. All right, appellant, you may proceed. May it please the Court, I'm Michael Hassett. I'm here representing Da Vinci Investment Limited Partnership, one of the two appellants with Mr. Daniel Griffith. Mr. Hester is here representing Mr. Griffith, and we have an agreement between the parties to split issues for argument purposes. I will be addressing the equal protection claim of both parties. Mr. Hester will be addressing the due process claims. And if I have any time whatsoever, I might touch on the Da Vinci takings claim, but I believe I will not, and I will stand on my brief on the takings claim. This is a summary judgment case where the trial court erroneously granted summary judgment in a hotly disputed, factually intensive case. The trial court said that there were undisputed facts, when in fact there are facts in this record that dispute the undisputed facts that the trial court said existed. And for that reason, the trial court should not have determined the equal protection claim as a matter of law. We have a – Why wasn't it a rational basis to deny it when more people opposed this one than the one two years before that was approved? I do not believe so, Your Honor, and the reason why those – You mean you disagree with me factually or legally? I disagree – Didn't more people oppose this one? More people – more people sent letters in opposition, yes. I believe it's not rationally related to this ordinance, because those people that opposed, that sent their letters, their emails, things like that, specifically said, I don't want a car wash on this corner. That is a use objection, and the use was granted in 1991 when this property was put into a PD. PD for CS uses, and that – Why does that matter under the Constitution? Maybe there's some Arlington Municipal Ordinance that was violated. But why does that make it unconstitutional if city council members, whose number one interest is getting reelected, said, boy, the public doesn't like this one. Let's vote it down. I mean, that happens every day on decisions every kind of legislative body makes in this country. Well, I believe it goes back to your very first question, which is, is this rationally related to a legitimate government interest? And the city could not enact a zoning ordinance that says we're going to only approve things if a majority of the people that show up allow us to. Why not? That would be removing our right to use our property. Neighbors don't have a right to determine what land is used for in their communities? It is not a legitimate use of the governmental power. What case says that? Your Honor, I don't believe that's been briefed in the court. So I'm not certain I can point this court to a case that says that, but we have a right to use our property. Neighbors get around all the time. That's why it's hard to find waste dumps. No one wants waste dumps in all kinds of things in their neighborhood. And politicians say, boy, I don't want the voters to get upset because I put a waste dump, or in this case a car wash, in my neighborhood. I'm not going to allow that. We have all these cases from people looking at these companies that do waste management, and they can never find places for their dumps because no communities want them. In this case, this property was zoned in 1991 with a permissible use of a car wash. And what they've done is take away that permissible use on a development plan application, where the development plan application itself says you have to meet the statute, the ordinance, that the city council is looking at. It was zoned for use as a car wash, but it still required city council approval before it could be used as a car wash, correct? That is correct, Your Honor. And so did city council have the discretion to grant or deny the application? I do not believe the council had discretion to deny. Because the ordinance itself, the development plan ordinance, says you have to incorporate these eight factors. And then the ninth factor says nothing in those eight factors will limit the council in requiring more stringent standards to protect the public's health, safety, and welfare. Other than that reference, do you have any language in the statute that the city council used which required mandatory approval if all of the other factors were met? I do not believe there is mandatory language in the ordinance, and I do not believe there is language in the ordinance that allows the city to simply deny.  Which would suggest that city council had discretion to approve or deny. But on the equal protection claim, Your Honor, immediately prior, shortly, 20 months prior, they granted that same development plan under the exact same ordinance for a different car wash less than two miles away. I think the property description was not exactly on all four corners as the applicants, though. There were differences between those two properties, were there not? Well, Your Honor, there's always going to be differences in the properties. So when city council in its discretion looks at two different applications with two different applicants, they have a decision to make as to whether or not to approve or deny. Correct? Correct, Your Honor. And so in this instance, absent mandatory language requiring approval, why wouldn't the duly elected officials of that city be vested with the authority to look at the two different applications and make a decision? Because we have a right to be treated equally under the law. It is our equal protection right. And in this particular case, a similarly situated property was treated differently, was granted a permit or granted a development plan on a similarly situated property that we did not receive. So we were treated differently, and that is our equal protection claim. Isn't this one on Ballpark Way in Austin near Six Flags and the Cowboys and Rangers Stadium in that main tourist area of Arlington? I'm sorry. They actually both are. Ballpark Way, this one's at Ballpark and Green Oaks, which is a little north of Six Flags. The area where the Cooper Street car wash case is on Cooper Street, a little south of that and a little east, but they're within two miles of each other. They're both at prominent intersections into the entertainment district in the city of Arlington. Isn't it like a welcome to Arlington sign or something near this one for both? At both. You think? Okay. Yes. And so what the trial court said here was that there were undisputed facts that show that these two properties were not similarly situated. However, he relied on evidence in saying that. He relied on the city's evidence and ignored the non-movement's evidence. This is a summary judgment case in which the trial court took as true everything the movement said and ignored everything the non-movement said about those similarities. Size is one. That's one huge factor because the courts have said size, use, and scope are what you have to look at in material facts on size, use, and scope to determine whether or not they're similarly situated. But there's no dispute this one generated more public opposition and the city council, some of the membership had changed. Well, it's interesting that the membership had changed because the one council member that took office between the time that Cooper Street property was approved and our property was denied is Mr. Charlie Parker. Mr. Charlie Parker set out on a, and this is all in the record, set out on a mission to have this denied because he was not going to allow a car wash to be on that corner. And so that shows why they weren't similarly situated. In two years ago, you had a council that didn't really care about the car wash. Now you have a new member elected who, according to you, his mission in life is to destroy this car wash. They're not similarly situated. It actually shows the arbitrary and capricious nature of this decision, Your Honor. Because someone, a new politician comes in and changes policies, has different policy views? It's not simply a policy view, Your Honor. He's taking away a constitutionally protected equal protection right to be treated the same way. I think your brief said something like this was a political decision. It wasn't to promote the safety and health of the community. Therefore, it's arbitrary and capricious. Wouldn't that make every law that gets passed in this country arbitrary and capricious, the fact that it's a political decision? I don't believe so, Your Honor. I believe that we're focusing on the facts of this case as to why we're treated differently than a similarly situated comparator property. And because politically influential people didn't like it, that makes it a violation of equal protection. I mean, every time a tax break is passed because politically influential people have the pull in Congress or in Austin in the state legislature, that makes it arbitrary and capricious? It is arbitrary and capricious when it is done behind closed doors with a specific, if you look at the Wheeler opinion, there is no legitimate governmental interest behind denying this development plan and approving the Cooper Street. There is no legitimate public health, safety, or welfare argument to be made. It is arbitrary and capricious, and therefore it is not rational. And that is what the Wheeler court found. I have used my nine minutes. Mr. Hester has time that I will yield to. All right. Thank you, counsel. May it please the court. My name is Sean Hester, and I'm here on behalf of the appellant, Daniel Griffith. I want to address a couple of things. First of all, this court, as you're well aware, has already decided at least partially the substantive due process issue with regard to constitutionally protected property right. And I want to make it clear that the constitutionally protected property right that we are asserting here today is in the use of the property as a car wash, not in the development plan application and the granting of it. I have a question, just a factual question. Why is this, I mean, okay, they want to build a car wash. They're having trouble. Why don't they build something else there? Why is this car wash so important? They're just the only person they could sell it to wanting to build the car wash, Mr. Griffith. Well, I think that and I think the other problem is now that there's doubt as to what the approved uses mean, and I don't think anybody knows what can be built there because in 1991, these uses were approved, and now they're basically saying, no, you can't build a car wash. Well, what else can't you do? So the problem is that you don't have a guaranteed use of the property even though you should. Well, isn't that the case for any property that is zoned multiple use property? Well, Your Honor, there's two reasons that the use is constitutionally protected in this case. First of all, the ordinance that was used for the plan development had mandatory language in it, and I'll read it. Let's see. Permitted uses in this district shall be determined at the time that the district is approved because that's 1991. So the permitted uses shall be determined in 1991. It goes on to further state the uses approved in accordance with this section shall not be changed on a concept brief or final development plan unless the ordinance approving such is amended. But doesn't that simply mean that that allows you to go to city council and seek that use, that these are the uses for this property. Therefore, I can prepare an application applying for this use, but it still requires city council approval. You couldn't go and ask city council to approve a non-permitted use. You can simply go and ask city council for a permitted use. Doesn't that ñ that's the way I'm hearing that. Your Honor, the way that I would state it is, is that ñ But now, am I incorrect that you still have to go before city council and get approval for a permitted use? I believe so. You have to go before city council to get the development plan approved, but the use itself has already been approved and it's mandatory. Well, in the plan itself you're seeking a permitted use, but city council still has to approve the plan which includes the permitted use, correct? Correct. Okay. Correct. Just to make it clear, we are not claiming, and this court has already ruled, that we have a constitutionally protected right in the development plan. If the development plan was the real reason that this was denied, we probably wouldn't have a case. Section 245 may make that a little bit different, but that's not the case here. This use was denied, not the development plan. Well, the use was approved, so we can use it for a car wash subject to rules, regulations, guidelines, and then reasonable restrictions, okay? So when we apply for a car wash, that use is already established. Now we have to meet the rules, regulations, guidelines, and restrictions that are put on it. Which we did. But at the end of the day, city council has to approve or not approve. And I asked your co-council this, and I'll ask you this. Is there anything that you can point me to where basically city council is compelled, when faced with a development plan for a permitted use, they're compelled to grant their approval? Yes, Your Honor. Okay. That would be the language in the ordinance itself that says that the use shall be determined when the planned development. That's the use, and that's not the approval. Is there anything that says that you can point me to city council shall approve? No, Your Honor. All right. However, we don't have to in this case because there were no, the city council did not use their discretion to place restrictions. If they have discretion, why isn't their denial part of their discretion? Because the denial effectively denies the use, which is approved, and there is a mandatory right to the use. So effectively, the denial, when you meet all the requirements and the guidelines, and I'm not going to get to a lot of this, but when you meet all of the requirements, guidelines, regulations, and you're still denied, that means two things. Number one, the denial had to have been based on the use. It can't be based on the requirements that the city put on you. Could it be based on the judgment of the city council members in considering the development plan as a whole and what's in the best interest of their city as to city council collectively making a decision? We say no. But that decision was made in 1991 to allow the use as a car wash. I'm talking about the development plan. I understand, and I think that's where, yes, they could do that. They could have told us. And that's what they did in this case. Didn't they deny the right to move forward with the development of the property and the development plan as explained to them, even if it was for permitted use? They denied the development plan, and it's our position that they could not have denied the development plan outright. They either had to approve it or conditionally approve it based on the order. So you're saying they had no discretion? I'm saying that they had no discretion because to give them discretion would deny the use, which was already approved. And the process of determining whether the use should be approved was done in 1991. It could have been amended, but it was not. Then why go before city council at all? If city council was compelled to approve a development plan that's put forth a permitted use, why not just go to some MIT manager in some agency that checks off the boxes and grants it? Why do you have to go before city council, the highest governing authority in the city, to get approval for something that you say that they were compelled to grant in the first place? Because they could have placed restrictions for health, safety, and welfare and enhancement of the property. They could have. You said all those boxes were checked. Well, they were because they didn't communicate any other boxes that we had to check. So they could have. They chose not to. They chose just to outright deny. If they said build a ten-foot gilded wall around it, then that would be a requirement, and then we would either have the decision of either meeting it or not. But we weren't given that choice. We were just told, even though your development plan meets all of the criteria, we're still denying. And we're not going to tell you why. We're not going to tell you what you have to do to get it approved. We're just going to deny it. And you're clearly stating they didn't have the discretion to do so. I'm clearly stating they did not have the discretion to change the use. Thank you, counsel. Your time has expired. Thank you. Appellee. May it please the Court. My name is Ed Voss, and I'm here on behalf of the city of Arlington, who is the defendant below and is the appellee in this case today. Sitting with me at table is Assistant City Attorney Cynthia Withers, so she's here from the city to observe and help me here. This court should affirm the decision of the district court that granted summary judgment in favor of the city because the district court correctly determined that as a matter of law, plaintiffs' substantive due process claim, equal protection claim, and takings claim under state law were without merit under the undisputed and undisputable facts. Now, what are those facts? I think the court has indicated through its questioning a pretty good knowledge of, I think, what happened as far as the facts go, and that was that in 1991, the planned development district was established for this property, actually for a bigger part of the property, and this was the last 1.45 acres that were undeveloped that was owned by the Da Vinci Investments Group. And then they contracted with Mr. Griffith to develop it as a car wash. So to do that, they had to submit a development plan, and the ordinances were very clear about needing to get development plan approval, even though there's a list of uses in the PD ordinance that said it could be used here. So they went through that. They applied for development plan approval. They went before the Planning and Zoning Commission, and they presented it. They modified it a few times, and then ultimately the development plan was denied there. They had the right to appeal to the Court of Appeals. I mean, sorry, that's where I am. They had a right to appeal to the city council, and the council agreed to hear the appeal, and they listened to it. And I want to make sure the court is aware that in the record, we transcribed the entirety of the city council hearing that listened to and determined this development plan application. It's DP 13-1, and in the record that transcript appears on pages 2339 through 2352. In that hearing, listened to not just the applicants, council, and to those in favor of it, but also listened to the neighbors who were opposed to it. At the end of the hearing, the motion was made by Councilman Parker, who said that he does not believe the development plan has mitigated the compatibility issues, nor did he believe that it enhances the neighborhood, and he also didn't believe that it takes into consideration the concerns of the majority of the neighbors. So he moved to deny, and the vote was 5-4 in favor of that motion, which meant that the development plan was denied. So I listened to what Mr. Hester said just a few minutes ago, and he said that they didn't provide any reasons, that the city council didn't have any reasons stated about why they denied this. I don't think the record bears that out. The record shows that there were at least three reasons stated at the conclusion of the public hearing on this particular development plan application. But you don't even need the reasons to be the ones that actually motivated the decision to pass rational basis. There just has to be a conceivable reason. So if you standing here today can come up with a conceivable reason, that gets passed rational basis, right? It does, and the district court not only looked at the reasons that were stated, but also looked at the rational basis part of things, and that of course was in the context of the equal protection claim. Being the differences between this particular development plan application and what the plaintiffs have pointed to that was approved a couple of years before at what they call the Cooper car wash, we call it the quick trip development. But as part of the quick trip development, there was a car wash component of that, and so they've been pointing to that. But our position was, and we presented the evidence to the court, the district court that showed how they were not similarly situated, that there were significant differences between both of those projects. And so that also provides a rational basis for our position. What are the significant differences? Those differences are outlined in the record on pages 2355 through 2357. That is actually a summary of the differences. We actually put in the paperwork that showed what was approved in 2011 under a different counsel and what was presented in 2013, a couple of years later. This application was a development plan application seeking approval. In 2011, PD 11-7, and I don't want to get too much in the alphabet soup, but PD is plan development district, development plan DP. So DP 13-1 was a development plan approval. PD 11-7 was requesting a zoning change from office community service and multifamily 18 to a plan development that was for community service uses with exclusions and with a development plan. The property size was different. In DP 13-1 here, it was 1.45 acres. In PD 11-7, the whole project was 5.149 acres and was in a different location. I think the court sounds like it's a little bit familiar with Arlington, but Cooper Street area and West Road or South, this particular property, the 1.425 acres is a little north. The ownership was different. Here we had the ownership by DaVinci Investment, one of the plaintiffs in the case. In the PD 11 scenario, the city actually owned 2.96 acres of the 5.149 acres and then Quick Trip owned the remainder. The property location was in a different council district. This DP 13-1 was in Council District 1. In the north sector, PD 11-7 was in Council District 3. The property frontage was different. The frontage in this scenario was on two different roads. In PD 11-7, it was only on one road, and there was different characteristics about that location with one being on two roads and being next to a residential neighborhood and how they're going to address traffic issues. Opposed in council seemed to suggest that city council's approval was almost mandatory in requiring approval and that once the boxes were checked for permitted use, city council was then in a position simply to approve. I think you said it was a second condition, conditionally approve if I heard correctly. There was no option to deny. What say you to that? I think he's wrong, and here's why. There's nothing in the ordinances that say that. There's nothing in, I heard what he said, and you recounted it very well, Judge Bennett, but there's nothing in the city's ordinances that required it.  There was discretion in the city's review of the development plan. The district court cited in particular section 9-300, subsection E, subsection 9, that says nothing listed shall limit the council's ability to require more restrictive standards necessary to protect the public's health, safety, and welfare. I've already recounted what the motion said, and the motion from Councilman Parker had three things that were not satisfied and that were, I think, additional requirements that needed to be satisfied, and they weren't satisfied to the council's, at least five of them, to their mind, to let this go forward. And interestingly, one of those... Council also made the point, if you could also address this, that by denying the use of the property for a car wash, city council was basically voting against a permitted use that had been in place for some time, as evidenced by his briefing. So what say you to that sub-argument that city council basically had to approve this or conditionally approve this? It's not borne out in either the facts or the ordinances. I heard what he said in that regard, and the city council wasn't faced with deciding whether this was a lawful use or not. That wasn't what was before them. Arlington has, or had, an unusual zoning ordinance, admittedly unusual, but it's undeniable that there were two steps involved here. The first step happened in 1991 when the Planned Development District was approved, and in that PD, the evidence is in the record that lists all the uses that are available. For any of them to be approved, however, they had to have a development plan approval or a concept brief approved. Now, one of the complaints they've made here is that they were somehow entitled to a lesser stringent standard under a concept brief versus development plan. Either way, they still had to get approval, and not just approval by staff, like in a platting scenario. One of the questions earlier was, you know, how is this different from when a staff member can just look at a checklist and just say this is okay? Isn't it true this had to go to the city council? The answer is yes, it is true. The ordinances made it clear. In section 5-300 of the ordinances, it says the procedure for development plan and site plan approval is outlined in section 5-200. 5-200 says the city council has authority to approve, and it's approving a zoning change. Well, what's a zoning change? A zoning change includes in section 5-100 an application for a development plan approval. It wasn't an approval of the use. It was to approve or not the development plan that was submitted and whether or not it met with what the council deemed, because it was their discretionary authority to determine whether this fit, and they determined that it didn't. This isn't the only discretionary language that was cited, and what I mean is the section 9-300 subsection E9. If you look at section 9-300, the development plan has a lot of discretionary and subjective standards listed in it. It has to have gross design standards. It has to be compatible with existing uses adjacent to the site. The standards should include landscape and screening regulations. Exactly what those are aren't specified by particular detail like you would see perhaps in a plat or some other detail. So is it correct to say that city council's vote was more a vote on the development of the property as opposed to a vote on the permitted use of the property? Exactly, and that's what was facing them was this particular development plan application on how it was to develop the property. And then on that point, I believe council referred to city council's decision as arbitrary, saying that they were not treated equally, and so you've outlined what you believe to be a rational basis for the decision, and you said that there were three reasons that were stated on the record at the time the decision was made. That's right. And of course, as Judge Costa indicated, as far as rational basis goes, in the equal protection context, we could come up with others. I mean, I was going through the list and I didn't get to finish, but I mean, there's more differences than what I was going through between the previous car wash and QT development with other things added to it that was just a car wash only. I mean, as already has been pointed out by the court, there were a couple of council members who were on the council back in 2011 who were not on the council in 2013. And the courts have said, and we cited those in the brief, that that in and of itself is a significant difference to show that these properties and these applications and these situations were not the same. So that their claim that these properties were similarly situated under these facts just doesn't hold water and is without merit. And the district court reviewed that and reviewed the differences and came to that conclusion. Now, one of the things that we have asserted in this appeal as an appellee is that the prior decision that this court made about three years ago when it was faced with my appeal at that time on behalf of the individual council members who used to be part of the case was that they were entitled to qualified immunity. And so the court ruled on the qualified immunity issue by looking at the two steps, the two parts. And first, it chose whether or not there's constitutional harm here. And I think that issue goes to what we've been talking about and that is because there was discretion and it's not just arbitrary discretion, there was not some sort of wild discretionary decision that was made here. It was actually based on what the ordinances say. That discretion meant that there was no entitlement to approval of this development plan. I listened to some of the questions  about where in the ordinances is there something that mandated that the city council must approve this development plan if all the boxes are checked. Well, number one, whether or not all the boxes are checked based on the ordinance provisions and they're provided in the record is still a matter of where I think reasonable amounts could differ. Obviously, it did at the city council level. Four of them thought it did. Five of them thought it didn't. So whether or not all the boxes are checked isn't a given. If we were faced with a situation where I had an ordinance that I was trying to defend and it was like a plat ordinance where it said, okay, here's a development plan provision and here are the requirements and the development plan shall be approved when you have met these, A, B, C, D, etc., then it would be a whole different case. I don't even know if I'd be here. But we don't have that. There's nothing in the city's ordinances at that time that says you shall approve a development plan if all these factors are met. That's totally different than what we have like in just a raw plat situation. This was a development that has subjective factors tied to it. And so there was nothing in there in the city's ordinances and the city council was not faced with a ministerial decision. It was faced with a discretionary decision. They don't like it, but that is what the rules were when they made their application. Nothing changed while their application was pending. They knew that going in and they were very diligent in trying to make changes to it to try to gussy it up to make it look as pleasing as possible. But the final decision maker was the council. They pointed to a lot of evidence about Councilman Parker and his political leanings and local politics and that kind of thing. But it wasn't just his decision. It was a decision of nine members of the Arlington City Council. And there's nothing in the record that shows or supports their argument that says they had to approve it. Now, that was what happened three years ago when this court issued its decision to say, well, okay, we're looking at whether or not there's constitutional harm here. But that was in the qualified immunity context and I understand that. But it's the same question. Here, is there constitutional harm? And it's the same facts. It's the same issues. And that is that, no, there wasn't anything in here that required approval. So, therefore, there was no property right. And if there's no property right, then you don't have a substantive process claim. Now, I started a lot of the case and Judge O'Connor agreed with that and then went the extra step and went through an analysis of what the evidence showed about whether or not there is any merit to their substantive due process claim and found it lacking. The same is true in the equal protection claim. The equal protection issues were whether or not the decision showed that they were treated differently from someone similarly situated with no rational basis. I think we've already addressed that. I did brief one issue, though, that Judge O'Connor really kind of avoided. And in the Inquist case, in Inquist, E-N-G-Q-I-S-T, the U.S. Supreme Court said that individualized particular local decisions that are discretionary like this are really not the kind of thing that warrant an equal protection claim. And this Court has followed that in the Gil Ramirez case that we cited and also in the integrity collision case that we cited. But in the last opinion in this case, which you're saying is law of the case, we said under our case law, it is clearly established that you can't have an equal protection claim based on a zoning decision. It's not going to be law of the case for what you like and not law of the case for what you don't like. That's why I put it toward the end of my argument. I understand the point here. You get the candor. But I still like it. Yeah, I mean, it's, yeah. But it's just the problem is we already decided. Well, it is, and I understand all that. But mainly... Nice try. Thank you. But as my time runs out, I think that a decision in favor of the appellants in this case would, I think, reverse some well-established precedent in this court and also in the U.S. Supreme Court and really would open up the opportunity for more folks to complain about local land-use decisions and involve the federal courts as more of a sort of a land-use review board that's not really appropriate. These facts don't support that kind of thing, and I would urge the court to affirm the district court's decision. All right, thank you, counsel. Rebuttal. Discretion is not the deciding factor in this case. I'll read from this court's opinion in McKeska v. City of Galveston because where a city has exercised discretionary authority, the city must still conform to its constitutional obligations. Thus, the city actions must be rationally related to some other independent and legitimate interest. And that's exactly why we have an equal protection claim in this case, that the trial court, in accepting all of the city's facts as true, the movements facts, and not listening to the non-movements facts, erred in summary judgment on the equal protection claim. And Mr. Voss just got up here and said, these two properties, the Cooper Street property and our property, are vastly different sizes. That's not true at all. The Cooper Street property is on an individual tract, an individually platted lot, that is 1.3 acres. Our property is 1.4 acres. Mr. Voss says it's 5.1 because that's four tracts of land that were involved in that PDCS zoning application. Our property was PDCS zoning for that tract as well, although it was a part of a larger PD that was developed at different times. The frontage issue that Mr. Voss brought to your attention, saying that Cooper Street has frontage on one side, is disingenuous when they make their argument that it's five acres, because if it's five acres, there's property frontage on two sides, just as there is on the Cooper Street project. This is the problem that the trial court did not resolve. The trial court said it's undisputed that these facts exist, but those facts are actually in dispute in the record, and there is a reasonable difference of opinion as to what those facts are and why these two properties are similarly situated. For the trial judge, on summary judgment, to make the decision as a matter of law that they're not similarly situated, he violated the rules of summary judgment. That's why we're asking this court to reverse the summary judgment on that equal protection claim and remand it back for trial. One quick question for you, and it's the counter question that I ask your opposing counsel, who has stated that the decision was rationally based. What can you point to in the record would suggest that the decision was arbitrary? All of the communications between council members and people who are in opposition to this, all of the ignoring of the immediately adjacent properties that supported this particular project, and the five-month program of Charlie Parker and Jimmy Bennett, who are council members, saying, we will kill this at council. So just the opposition to the development plan constitutes the arbitrary nature of city council's decision. It's not the opposition, it's the manner in which it was developed, it's the manner in which it was solicited, and it's the ignoring of the actual guidelines that are set out in the ordinance, which without question every single city council member agreed in their depositions, and that's in the record that we met all those guidelines for our development plan approval. Thank you, counsel. Thank you. Mr. Hester, did you reserve some time for rebuttal? I did, Your Honor. All right, you may proceed. Two minutes. I want to address a couple of things. First of all, as Mr. Hassett just said, I want to make it clear that all of the requirements that were placed upon this use were met. And you ask if the statute says if we meet all the requirements, is it mandatory that they grant the development plan? Well, I would turn that around and say there's nothing in the ordinance that allows them to deny the development plan. The ordinance says that they can put additional restrictions based upon health, safety, and welfare. It did not say they could just outright deny it. But they did not do that in this case. What they did is they stated some amorphous statements as to why they were denying, and I'm going to read them. Development plan did not mitigate compatibility issues. The project would not enhance the neighborhood and failed to take into consideration concerns of the majority of the neighbors. Would any of those decisions or stated reasons constitute a rational basis for denying the development plan? I would say they don't. Development enhancing the neighborhood is not a rational basis for city council denying the development of property within their jurisdiction. I would agree with that. But again, in my opinion, they really didn't deny the development plan. They denied the use. The city has done a really good job of making this about the development plan. The problem is we met all of the guidelines that were set forth that took into account enhancement of the neighborhood and that kind of thing. And so once we met those, they could put additional restrictions. That's their discretion. You say you met the requirement of enhancement of the neighborhood, but five of the city council members said you did not, in their view. Well, when the statute or when the ordinance was, when the property development was passed, one of the things that had to be considered was enhancement of the neighborhood. So what I'm saying is that was already considered when the use was approved. And it's the use that we're talking about the city's making about the development plan. But they don't have any mandatory language or any language allowing them to deny the development plan. I'm out of time. Thank you, sir. Thank you, council. We'll take this matter under advisement. We are adjourned.